
FILED
AUGUST 29, 2008
KAREN S. MITCHELL
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 2:08-CR-0048 (1) |
| | § | |
| CLARK PAUYO | § | |

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS

Came for consideration the motion to suppress filed August 15, 2008, by defendant CLARK PAUYO. On August 26, 2008, an evidentiary hearing on defendant's motion was held. On August 28, 2008, both parties submitted supplemental briefs. Upon consideration of the evidence presented at the hearing, the pleadings, and controlling case law, the undersigned United States Magistrate Judge is of the opinion defendant's motion to suppress should be DENIED.

I.
FACTUAL BACKGROUND

On June 30, 2008, at approximately 12:10 a.m., defendant PAUYO was driving his tractor-trailer rig eastbound on I-40 in Oldham County, Texas, when Texas Department of Public Safety (DPS) Trooper Mark Lancaster observed a defective mud flap on the rig. At approximately 12:13 a.m., Trooper Lancaster stopped defendant for violation of Texas Transportation Code Annotated § 547.606 and Texas Administrative Code Title 37, Part I, Chapter 21, Rule 21.1(7)(g)(6) & (7). After stopping the rig, Trooper Lancaster made contact with defendant by approaching the cab on the passenger side and requested defendant's driver's license, insurance, bill of lading, and log book. At approximately 12:18 a.m., Trooper Lancaster asked defendant to accompany Lancaster to his patrol car. As they were walking to the patrol car, Trooper Lancaster explained to the defendant

why Lancaster had stopped him, *i.e.*, for having a defective mud flap in violation of Texas law, and showed defendant why the mud flap was defective.

After Trooper Lancaster and defendant PAUYO were seated in the patrol car, Lancaster initiated computer checks, including a criminal history check.[1]  Before the computer results returned,[2] Lancaster asked defendant PAUYO how long defendant had been driving and how many trucks the company owned.  Defendant PAUYO did not immediately answer Lancaster's questions.  At approximately 12:22 a.m., Lancaster instructed defendant PAUYO to purchase a replacement mud flap and handed something to defendant.[3]  Lancaster asked defendant PAUYO routine questions regarding what was in the trailer, how many pallets were inside, whether defendant had observed the trailer being loaded, and where the trailer had been loaded.  Defendant PAUYO was slow to answer Lancaster's questions and had to be prompted by Lancaster to answer where defendant picked up his load.

Trooper Lancaster continued to examine defendant's logbook, noting the logbook showed defendant picked up his load in Hayward, California, on June 27, 2008.  The logbook also showed defendant made a lengthy rest stop (12 ½ hours) in Buckeye, Arizona.  According to the logbook, defendant made another rest stop of 2 ¼ hours in Jamestown, New Mexico, which was only 4 ½ hours away from his Arizona stop.  In addition to the logbook, defendant had three bills of lading indicating he was carrying commercial refrigeration units bound for Illinois, Ohio, and Pennsylvania.  Trooper Lancaster believed defendant's cargo was odd, given the fact that defendant

---

[1] Trooper Lancaster testified that he ran the criminal history check because of suspicious stops noted in defendant PAUYO's logbook.

[2] Defendant PAUYO's criminal history was reported clear at approximately 12:20 a.m., and his other information checks were reported clear at approximately 12:21 a.m.

[3] Trooper Lancaster did not testify as to what he handed to defendant PAUYO at that time, and the video of the traffic stop does not make clear what documents Lancaster handed to defendant.  However, based on Trooper Lancaster's testimony at the hearing, it does not appear that Lancaster was handing defendant PAUYO the warning at this time.

was pulling a "reefer" unit,[4] which would usually be hauling produce or other perishable goods, especially during the summer months. Lancaster also found defendant's route odd, given the fact that I-80 would have been the more direct route to reach Illinois, Ohio, and Pennsylvania; yet, defendant had taken I-10 before taking I-40, which added considerable mileage to defendant's trip. *See* Gov't Ex. 1. At approximately 12:26 a.m., Trooper Lancaster exited his patrol car to examine the seal on the trailer, which Lancaster found did not match the seal number listed on the bill of lading. Lancaster also noted the seal on the trailer read "Gess Frozen Foods."[5]

At approximately 12:27 a.m., approximately six minutes after the computer checks came back, and while in the process of issuing a citation,[6] Trooper Lancaster informed defendant PAUYO that the seal number on the trailer did not match the number on the bill of lading and asked defendant if he would be willing to let Lancaster look inside the trailer. Defendant PAUYO replied negatively and stated he did not have a problem, but did not understand. Lancaster told defendant it wasn't the right seal number. Lancaster again asked defendant PAUYO if defendant would allow Lancaster to look inside the trailer, and at approximately 12:28 a.m., defendant said he had no objection and agreed to let Trooper Lancaster look inside the trailer.

When defendant PAUYO went to the truck's cab to retrieve the key for the trailer lock, Trooper Lancaster opened a vent door on the rear of the trailer and smelled a combination of marijuana and fabric softener.[7] At approximately 12:30 a.m., Trooper Joe Livermore arrived at the scene of the traffic stop. As shown on the video of the traffic stop, Livermore also smelled what he believed was a combination of marijuana and fabric softener coming from the trailer through the vent. Defendant PAUYO then returned to the rear of the trailer with the key for the trailer lock.

---

[4]Refrigeration unit. According to Trooper Lancaster's testimony, reefer units are usually used for transporting perishable goods because such trailers are refrigerated.

[5]According to the bills of lading, the shipper of the refrigerated units was Jimex Corp.

[6]Trooper Lancaster testified that he was in the process of issuing the citation when he requested consent to search the trailer.

[7]The fabric softener was used, presumably, in an attempt to mask the odor of the marijuana.

When the trailer was opened, Trooper Lancaster climbed inside, and again detected an odor of marijuana and fabric softener. Inside the trailer, Trooper Lancaster observed several large refrigerator units on pallets packed all the way to the rear of the trailer. Trooper Livermore boosted Trooper Lancaster over the rear units, and, after crawling over the refrigeration units, Trooper Lancaster discovered several pieces of luggage located at the front of the trailer. The luggage was filled with a large quantity of marijuana. Consequently, at approximately 12:35 a.m., defendant PAUYO was placed under arrest and advised of his rights.

## II.
## PROBABLE CAUSE FOR THE TRAFFIC STOP

At the hearing, defendant argued his Fourth Amendment right against unreasonable search and seizure was violated by Trooper Lancaster's actions because (1) the stop was unreasonable from its inception, as no traffic violation occurred, or (2) the stop was unreasonably extended beyond the time necessary to issue the warning. In defendant's "Supplemental Material on Motion to Suppress," defendant argues, for the first time, that Trooper Lancaster could not lawfully stop defendant PAUYO for a violation of Texas Administrative Code Title 37, Part I, Chapter 21, Rule 21.1(7)(g)(6) because subsection (7)(g)(8) of that rule allows for a "tolerance" of four inches, which defendant interprets to mean that a citation may not be issued, nor a stop effected, unless a mud flap is over twelve inches from the ground.[8] A routine traffic stop is analyzed under the guidelines set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Under *Terry*, the court must determine the reasonableness of the search or seizure by asking (1) whether the officer's action was justified at its inception; and (2) whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place. 392 U.S. at 19, 88 S.Ct. at 1878. In the context of a traffic stop, obtaining identification,

---

[8]Because of this new argument, additional briefing, or an additional hearing, might be necessary. However, as discussed *infra*, Trooper Lancaster had probable cause to stop defendant PAUYO for having a non-rigid mud flap, regardless of how far off of the ground the mud flap was hanging.

registration, and insurance papers, running warrant checks, and asking questions of the driver regarding his travel itinerary are all reasonably related to the reason for the stop. *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993). "Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Gonzales*, 328 F.3d 755, 758 (5th Cir. 2003) (citing *United States v. Machuca-Barrera*, 261 F.3d 425, 434 (5th Cir.2001); *Shabazz*, 993 F.2d at 436). However, "a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop." *United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2004) (en banc).[9]

According to Trooper Lancaster's testimony, he initiated the traffic stop after observing what he believed to be a violation of Texas Transportation Code Annotated § 547.606 and Texas Administrative Code Title 37, Part I, Chapter 21, Rule 21.1(7)(g)(6) & (7).[10] Defendant argues in his supplemental pleading that Trooper Lancaster could not have lawfully stopped and cited defendant for violation of the regulation requiring mud flaps to be no more than eight inches from the road's surface because that same regulation allows for a "tolerance of four inches." Tex. Admin. Code Title 37, Part I, Chapter 21, Rule 21.1(7)(g)(3). Thus, defendant argues, Trooper Lancaster did not have probable cause to stop defendant because Lancaster testified he believed the mud flap was no more than twelve inches off of the ground and because, when measured while the vehicle was stationary, the mud flap was only eight inches off of the ground.

At the hearing, Trooper Lancaster testified that he stopped defendant PAUYO because the right rear mud flap was more than eight inches off of the ground when the vehicle was moving *and*

---

[9]On page 2 of defendant's supplemental brief, counsel cites to *United States v. Brigham*, 343 F.3d 490, 498 (5th Cir. 2003), in support of his argument that Trooper Lancaster unlawfully held defendant PAUYO by continuing to question defendant after the checks came back clear. However, the *Brigham* decision counsel cites was overruled by the en banc decision in *United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2004).

[10]The video shows the right mud flap was not as rigid as the left mud flap, which is one of the reasons Trooper Lancaster effected the traffic stop.

because it was not rigid. Texas Administrative Code Title 37, Part I, Chapter 21, Rule 21.1(7)(g)(7) states, "The construction of safety . . . flaps will be such that they will remain in proper place back of rear wheels and *will be rigid* enough to prevent slush, mud, or gravel being transmitted from the vehicle's rear wheels to the windshield of the following vehicle." (emphasis added). Trooper Lancaster also stated the eight to twelve inch tolerance meant that a person with a defective mud flap over eight inches, but under twelve inches, would be stopped, but would only receive a warning. Whether Trooper Lancaster's interpretation is correct is not critical, since the other violation (non-rigid mud flap) was also a basis for the stop. In addition to Trooper Lancaster's testimony, the video of the traffic stop also shows that the right rear mud flap was not rigid in comparison with the left rear mud flap. Based on Trooper Lancaster's testimony and the evidence of the violation on the video, Lancaster had probable cause to stop and to issue a citation or a warning to defendant PAUYO based on the violation of Texas Administrative Code Title 37, Part I, Chapter 21, Rule 21.1(7)(g)(7), regardless of whether Lancaster could have lawfully stopped defendant for having a mud flap hanging between eight and twelve inches from the road's surface.

After making the stop, in the course of a routine review of defendant's documents, Trooper Lancaster noticed suspicious inconsistencies between the seal number on the trailer and the seal number listed on the bill of lading, as well as inconsistencies between the type of cargo defendant was allegedly carrying and the type of trailer being used. Lancaster's review of the documents was initially related to the reasonable scope of the stop.[11] *See Shabazz*, 993 F.2d at 435. Before Trooper Lancaster had issued a warning, suspicious facts emerged, *e.g.*, defendant's chosen route in light of his destinations, inconsistences between the number on the trailer seal and the seal number on the bill of lading, and defendant's reluctance to answer routine questions, and additional reasonable suspicion was created. The emergence of these facts enabled Trooper Lancaster to reasonably

---

[11]Although defendant argues that Texas authorities (DPS) do not enforce logbook irregularities or issues regarding seals, Trooper Lancaster's inquiries were relevant to the issue of whether the trailer contained contraband or stolen goods.

prolong[12] the encounter in order to investigate the suspicious circumstances, which indicated to Lancaster, based on his experience, that illegal contraband might be inside the trailer.[13] Consequently, even if Lancaster had issued the warning prior to requesting permission to search the trailer, the emerging facts provided Lancaster with reasonable suspicion to further investigate, and defendant PAUYO's short period of detention was not unreasonable.[14]

III.
CONSENT FOR THE SEARCH

Defendant PAUYO contends the search was not authorized by law because the stop itself was unlawful and any consent given was done so in the course of Trooper Lancaster's illegal conduct or, alternatively, the stop ended when Lancaster could have issued, or actually issued, the warning, and thus, any consent given was tainted. At the hearing, however, defendant conceded that if the stop was reasonable at its inception and continued to be reasonable through the time consent was given, then defendant's consent appeared voluntary. The government contends defendant unequivocally consented to the search before the traffic investigation was completed. The Fifth Circuit has enunciated the following multi-factor test for determining whether consent is voluntary: 1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found. *United States v. Jones*, 234 F.3d

---

[12]The entire encounter from the time Trooper Lancaster effected the stop to the time he obtained consent from defendant PAUYO to search lasted only fifteen minutes. In light of the circumstances, a fifteen minute investigation before seeking consent to search was not unreasonable.

[13]Lancaster testified that he suspected the trailer contained either illegal drugs or illegal aliens because defendant was carrying non-perishable goods in a reefer unit and because defendant had traveled through and stopped near Phoenix, Arizona, which, according to Lancaster's testimony, is a known hub for smuggling drugs and aliens.

[14]Trooper Lancaster also testified that a traffic stop of a loaded tractor-trailer necessarily takes longer than a stop of a passenger vehicle because of the extra documents, *e.g.*, log books, that have to be examined and the extra checks that have to be run.

234, 242 (5th Cir. 2000)(citing *United States v. Shabazz,* 993 F.2d 431, 438 (5th Cir. 1993)). "The government bears the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Shabazz*, 993 F.2d at 438. The consent must not only be voluntary, but also be an act of free will, unconnected to any illegal seizure. *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993).

As discussed in section II, *supra*, Trooper Lancaster's detention of defendant PAUYO was reasonable from its inception and remained reasonable, regardless of whether Lancaster could have issued the warning at an earlier point in the detention. According to Lancaster's testimony, he was in the process of issuing the warning when he requested consent to search. Thus, if PAUYO did voluntarily consent, such consent was not tainted by an illegal detention. The Government concedes that defendant was never informed of his right to refuse consent to the search, a fact which weighs against a finding that the consent was voluntary. However, the remaining circumstances surrounding defendant's consent weigh in favor of finding he voluntarily gave his consent. Nothing indicates Trooper Lancaster used an intimidating demeanor with defendant at any time. Defendant PAUYO is a licensed truck driver, which indicates he is experienced in interactions with law enforcement, and, therefore, would not be overly intimidated by the situation. Defendant apparently speaks and understands English. Finally, given the extent of the concealment of the marijuana— the use of fabric softener in an attempt to mask the scent of the marijuana, the refrigerator units blocking view of anything stored in the trailer beyond the units, and Trooper Lancaster having to be boosted over the refrigerator units and crawl to the front of the trailer to find the marijuana—there appears to be a reasonable inference that defendant did not believe the drugs would be found if he consented to the search. Thus, in light of the above facts, this Court finds defendant PAUYO's consent to the search was voluntary.

## IV.
## CONCLUSION

First, Trooper Lancaster obtained consent for the search from defendant PAUYO before Lancaster issued any warning citation, and therefore, the consent was not unlawfully obtained. Even if Trooper Lancaster had issued the warning citation prior to seeking consent, the emerging facts discovered through Lancaster's routine investigation gave rise to reasonable suspicion of additional illegal activity, which would have allowed Lancaster to temporarily prolong the encounter to investigate those facts. Thus, defendant PAUYO's consent would not have been tainted by an unlawfully prolonged detention. Second, defendant PAUYO'S consent to the search was voluntary, and such voluntary consent was not tainted by any unlawful detention. Consequently, the evidence obtained during the search should not be suppressed.

## V.
## RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the motion to suppress filed by defendant CLARK PAUYO be DENIED.

## VI.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 29th day of August 2008.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

# * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation. This case is set for docket call on Monday, September 15, 2008. Consequently, the time in which to file objections is shortened. In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is ten (10) calendar days from today, or **on or before Monday, September 8, 2008, by noon.**

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).